J-S13044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.D.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: GAL | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 40 MDA 2022 |

Appeal from the Decree Entered November 30, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2020-02383


BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED:  MAY 11, 2022**

Appellant, Guardian ***Ad Litem*** ("GAL"), appeals from the November 30, 2021 decree denying the petition filed by the Lancaster Country Children and Youth Social Service Agency ("Agency") to involuntarily terminate the parental rights of Appellees, L.R. ("Mother") and M.P. ("Father"), to their minor female child, S.D.P. ("Child"), pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) and (b).  After careful review, we affirm.[1]

The orphans' court summarized the extensive factual background of this case as follows:

> [Child] is a minor female child born [in 2019].  On December 17, 2019, the Agency received a report on [Appellees'] family. The report was that [Mother] had

---

[*] Former Justice specially assigned to the Superior Court.

[1] The record reflects that Agency has not filed an appeal in this matter.

given birth to her sixth child. At that time, the household consisted of Mother [] and [Child]. Father of [Child] is reported to be [M.P.] The Agency's concerns were for the drug use by both parents, including [Mother] while pregnant. Upon [Child's] birth, the Agency took [Child] into custody at the hospital.

The Agency has a history of reports dating back to 2005 for four other previous children of Mother, all of whom are not currently in Mother's custody and reside with their respective fathers, and four other previous Children of Father, who are not in Father's custody, and for whom Father's parental rights were involuntarily terminated on February 1, 2017. Both Mother and Father have an additional previous child together, [L.P.], who was born on June 23, 2018, and of whom the Agency currently has custody. [L.P.] was placed in the Agency's custody at five days old after [Mother] tested positive for methamphetamines and amphetamines, and [L.P.'s] meconium test had also been positive for methamphetamines and amphetamines. The Agency attempted to implement a Safety Plan with the family, however, when that failed, [L.P.] was taken into protective custody by the Ephrata Borough Police and then released to the Agency. On July 2, 2018, [L.P.] was adjudicated dependent, and the court approved a Child Permanency Plan with objectives for [Mother] to complete for reunification with [L.P.]. The court also found aggravated circumstances against [Father] and ordered no plan for reunification for Father and ordered no further efforts to reunify. The child permanency plan created for Mother for reunification with [L.P.] included the following objectives: mental health, drug and alcohol, parenting, income, housing, and commitment. [Mother] attempted but did not complete any of her objectives for reunification with [L.P.] On August 19, 2019, [Mother] signed consents to Adoption for [L.P.]. On September 26, 2019, [Father] signed Consents for Adoption for [L.P.]. As of the Termination of Parental Rights hearing on September 27, 2021, for [Child], [L.P.] had been adopted.

- 2 -

Both Mother and Father have criminal histories. In 2006, Mother pleaded guilty to felony Theft by Unlawful Taking, and in 2007, she pleaded guilty to felony Forgery, Theft by Unlawful Taking, Receiving Stolen Property, and Unsworn False Authorization Forged Document. In 2019, Father pleaded guilty to two counts felony Manufacture, Delivery, or Possession with Intent, False Identification to Law Enforcement, Retail Theft, Possession of Marijuana, two counts Use/Possession of Drug Paraphernalia, Intentional Possession of Controlled Substance, and two counts of Driving with a Suspended/Revoked License. Father also pleaded to crimes committed in 2018 including Intentional Possession of a Controlled Substance. In 2016, Father pleaded guilty to Marijuana – Small Amount, Driving Without a License, Retail Theft, and Disorderly Conduct. In 2015, Father pleaded guilty to felony Burglary, felony Access Device Issued to Another Not Authorized, felony Conspiracy Access Device Issued to Another, Theft by Deception, Theft from a Motor Vehicle, four counts misdemeanor Access Device Issued to Another, two counts Theft by Unlawful Taking – Moveable Property, and Retail Theft. Father was incarcerated at the Lancaster County Prison from June 18, 2018 [to] February 19, 2019, from March 28 [to] April 11, 2019, and from September 19 [to] November 7, 2019. Father is currently on probation.

Mother is currently receiving treatment for opioid addiction, ADHD, and anxiety. Mother's last positive drug screen for an illegal substance occurred on June 19, 2020, for methamphetamines. Mother did not initially have, but now does have, as of April 2021, a valid medical marijuana card for the treatment of her anxiety. Mother also receives medication management for her mental health from T.W. Ponessa, which she began in 2018 and then restarted treatment in 2021. Mother is currently attending mental health and drug and alcohol counseling through Advanced Counseling and Testing Solutions, and that treatment began in February of 2021. Prior to her treatment at Advanced Counseling and Testing Solutions, Mother had admitted herself to Blueprints

Rehab inpatient program on April 26, 2020, which she completed successfully and was discharged on May 22, 2020. Mother transferred to Blueprints Intensive Outpatient in May of 2020. Because of a positive drug test on June 19, 2020, the provider recommended that Mother do inpatient treatment again. However, Mother was not able to do that because she would lose her employment and her home. Therefore, Mother was unsuccessfully discharged from the Blueprints Intensive Outpatient program. Mother then reported going to Community Services Group for treatment. However, this treatment was not able to be confirmed by the Agency. Mother also reported going to treatment with Advanced Counseling & Research, but this treatment was not able to be confirmed by the Agency. Then, the Agency caseworker thought there may have been a miscommunication and reached out to Advanced Counseling and Testing Solutions but was not able to confirm that Mother was receiving treatment there. Mother then reported that she went to LGH Behavioral Health in September of 2020, and the Agency was able to confirm that Mother did start that program. Mother was discharged from the LGH program reportedly because of lack of cooperation or participation, and Mother reported at that time that she was struggling to be able to have appointments because of her work. Although there was a gap in treatment, Mother then followed that program with the program at Advanced Counseling and Testing Solutions, where she is currently receiving treatment for mental health and drug and alcohol, which began in February of 2021. Since March 15, 2021, the Agency was able to drug screen Mother, typically, twice a week. The drug screening performed by the Agency from March 15, 2021, onward continues to be valid and negative.

Mother obtained employment at the United States Postal Service on September 26, 2020. Mother resigned from that job in June of 2021 to find a job that would allow her more flexibility to attend counseling appointments, be able to make visitation appointments with [Child], and to work on her plan for reunification. On September 27, 2021, Mother

- 4 -

reported that she was about to begin a new position on second shift at LSC Communications with a start date of September 28, 2021. Mother received unemployment compensation between the time she left the post office and until beginning her new position at LSC Communications. Although provided very sporadically to the Agency, Mother has submitted her income verification, proof of making rent payments, and provided utility bills.

Father and Mother began living together circa November 2019. The lease for Mother's current residence was entered into in May of 2020. The one-year lease term expired in May of 2021, and the lease is now month to month. The Agency caseworker conducted a home visit to Mother's current residence in July of 2021, and the caseworker reported that the home is appropriate. The Agency also acknowledged that some of Mother's teenage children do have overnight visits at Mother's house. The Agency did not express any concerns about these children being in Mother's care during these visits.

Visitation time for Mother with [Child] is twice a week for two hours at each session. Mother began exercising her visitation from the onset of the case. There was an interruption of in-person visitation due to the Covid-19 pandemic where parents were only offered virtual visits. Mother did not visit virtually. The Agency caseworker reported that Mother felt that she would not be able to connect with [Child] by participating virtually because her child was only five months old at the time of the virtual visits. Once in-person visits resumed on March 15, 2021, Mother began visiting again with [Child] regularly and was fairly consistent with those visits.

Father's visitation with [Child] was originally two hours per week, was subsequently reduced to one hour per week, but since the last hearing, has been increased to twice a week for two hours to coincide with Mother's visitation. [Child] has also been able to have visitation with her closest-in-age sibling, and the Agency has allowed for maternal siblings to join

Mother during the parent/child visits. Mother and Father are appropriate during visits with [Child] and both are fairly consistent in making visits with [Child] with a few visits that needed to be rescheduled.

The Agency would not provide a permanency plan for Father to complete unless and until Father filed an appeal for his recent criminal conviction(s) for which Father was already serving with probation. Father did not file an appeal of his conviction(s). An agency caseworker informed Father that if no plan was made, that Father was recommended to do similar objectives to Mother's plan, try to make progress on his own, and then contact his lawyer and request a plan, and that any progress he would make would help towards achieving that goal. The Agency's only expressed concern with Father living at Mother's residence was that Father does not have a plan and hasn't proven or shown that he would be appropriate in accordance with a plan.

The Agency Caseworker reported that Father was receiving drug and alcohol and mental health services through his probation officer, and that, Father is regularly screened for drugs by probation and has been negative since. The Agency asked Father about his progress several times. Father reported to the Agency that he is no longer in the drug and alcohol [program] through his criminal probation plan, that Father did complete it, and that Father could have been discharged sooner but requested to continue with the program until his insurance would no longer cover it. Lastly, as of September 27, 2021, Father was reported to be working for the same company as he previously reported to the Agency in December of 2020.

Orphans' court opinion, 11/30/21 at 1-6.

Child was adjudicated dependent pursuant to 42 Pa.C.S.A. § 6302(1) on January 6, 2020. As noted, on December 11, 2020, the Agency filed a petition to involuntarily terminate Mother's and Father's parental rights to Child,

pursuant to Sections 2511(a)(1), (2), (5) and (b). At the time the Agency filed the petition, Child had been in its custody for 11 months and 5 days. The orphans' court conducted evidentiary hearings on August 9 and September 27, 2021.

> At the second hearing on September 27, 2021, Mother and Father were both present in person. The court found in its order that Mother had achieved moderate compliance with the permanency plan and was making moderate progress towards alleviating the circumstances that resulted in placement of [Child]. Specifically, the court observed Mother in a very composed manner, and who had appeared to have taken steps in improving her mental health and working towards her continuing sobriety. Additionally, [M]other had held stable employment with the United States Postal Service, subsequently found a new job that would better accommodate Mother's ability to work on her plan and more regularly attend visitation with [Child]. Mother, on her own merits, signed up for and has been regularly attending counseling. With the assistance of her provider, Mother also reported progress in finding a good balance in her medication management.
>
> . . . .
>
> Both Mother and Father seem to enjoy their time visiting with [Child] showing a commitment to providing nurturing care for [Child].

Orphans' court opinion, 11/30/21 at 9-10.

Following the hearings, the orphans' court entered a decree on November 30, 2021, finding that the Agency had failed to meet its burden of proving by clear and convincing evidence that termination was warranted in this matter and denying the Agency's petition. On December 30, 2021, GAL

filed a timely, amended notice of appeal. Contemporaneously with this notice of appeal, GAL filed a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b). On January 25, 2022, the orphans' court filed its Rule 1925(a) opinion.

GAL raises the following issues for our review:

> 1.  Whether the [orphans'] court committed an error of law and/or abused its discretion by determining that the Agency had not proven by clear and convincing evidence that involuntary termination of parental rights of Mother and Father was warranted pursuant to Pa. C.S.A. §2511(a)(1)?
>
> 2.  Whether the [orphans'] court committed an error of law and/or abused its discretion by not analyzing the developmental, physical and emotional needs and welfare of the Child pursuant to 23 Pa. C.S.A. § 2511(b)?
>
> 3.  Whether the [orphans'] court committed an error of law and/or abused its discretion by failing to properly consider the requirements of the Pennsylvania Adoption and Safe Families Act (ASFA) provisions of the Pennsylvania Juvenile Act[2] as it relates to permanency for the Child?

GAL's brief at 4 (footnote added).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the

---

[2] *See* 42 Pa.C.S.A. §§ 6301-6375.

- 8 -

factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and internal quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

- 9 -

We have defined "clear and convincing evidence" as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the Agency sought to terminate Mother's and Father's parental rights to Child pursuant to Sections 2511(a)(1), (2), (5), and (b), which provide as follows:

**§ 2511.  Grounds for involuntary termination**

**(a)  General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

- 10 -

(5)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

**(b)    Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned November 30, 2021 and January 25, 2022 opinions of the orphans' court, it is our determination that

the GAL's claims warrant no relief. The orphans' court comprehensively discussed each of the GAL's three issues on appeal and concluded that they were without merit. We find that the conclusions of the orphans' court are supported by competent evidence and are clearly free of legal error.

Specifically, we agree with the orphans' court that its determination that the Agency did not prove by clear and convincing evidence that the involuntary termination of Mother's and Father's parental rights was warranted under Section 2511(a)(1) was supported by competent evidence. Orphans' court Rule 1925(a) opinion, 1/25/22 at 3-12.

We further agree that contrary to the GAL's contention, the orphans' court was not required to complete an analysis under Section 2511(b) because it did not find any statutory grounds for termination under Section 2511(a)(1), (2), or (5). *Id.* at 13-15. In any event, the record reveals that the orphans' court did, in fact, conduct an evaluation of what would be in Child's best interests. ***See id.***

Lastly, we agree with the orphans' court that "it was not appropriate for [it] to consider ASFA because (1) this issue was not raised at the trial court level by the GAL or any other party, which waives the issue, and (2) in the alternative, the Agency had not finished making reasonable efforts in this case." *Id.* at 16-18.

Our standard of review requires us to accept the findings of fact and credibility determinations of the orphans' court where, as here, they are

- 12 -

supported by the record. ***See In re T.S.M.***, 71 A.3d at 267. Based on the foregoing, we agree with the orphans' court that it did not abuse its discretion by denying Agency's petition to involuntarily terminate Mother's and Father's parental rights to Child.

Accordingly, we adopt the comprehensive January 25, 2022 opinion of the Honorable David R. Workman as our own for purposes of this appellate review. The parties are directed to attach a copy of the orphans' court's January 25, 2022 opinion to all future filings relating to our disposition in this appeal.

Decree affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/11/2022

Circulated 05/09/2022 09:44 AM

## IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
### ORPHANS' COURT DIVISION

| | |
|---|---|
| IN RE: S.D.P., A MINOR | : No. 2383 of 2020 |
| APPEAL OF: GAL | : |
| INVOLUNTARY TERMINATION | : SUPER. CT. DKT. No.: 40 M.D.A. 2022 |

## OPINION PURSUANT TO RULE 1925(A) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

BY:    Workman, J.                                                                    January 25, 2022

This Opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. On January 6, 2020, [S. D. P.], a minor child, was adjudicated dependent pursuant to 42 Pa. C.S.A. § 6302(1), by order of the Honorable Jeffrey J. Reich of this Court. On December 11, 2020, the Lancaster County Children and Youth Social Service Agency (hereinafter, "Agency") filed a Petition to Terminate the Parental Rights of Parents ("TPR"), [L. R.] (hereinafter, "Mother") and [M. P.] (hereinafter, "Father"), as to their child, S.D.P., pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), and (5). An evidentiary hearing related to this petition was conducted before the Court on August 9, 2021, which was not able to be concluded on that day; therefore, a second portion of the evidentiary hearing was scheduled and subsequently held on September 27, 2021.

On November 29, 2021, following the termination hearing and after review of the Juvenile Court record pertaining to the Child, the Court issued an opinion finding that the Agency failed to meet its burden and DENIED the Agency's Petition for Termination of Parental Rights as to Father and Mother.

-2-

On December 30, 2021, Attorney Kathleen Holmes, as the Guardian ad litem ("GAL"), timely filed a Notice of Appeal and Concise Statement of Matters Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b). The GAL raises three issues on appeal. First, the GAL avers that "[t]he trial court committed an error of law and/or abused its discretion by determining that the Agency had not proven by clear and convincing evidence that involuntary termination of parental rights of Mother and Father was warranted pursuant to [23] Pa. C.S. § 2511(a)(1) when its decision was not supported by competent evidence . . ." as outlined by the GAL in her points (a) through (e). Second, the GAL avers that "[t]he trial court committed an error of law and/or abused its discretion by not analyzing the developmental, physical, and emotional needs and welfare of the child, S.D.P., pursuant to 23 Pa. C.S. § 2511(b) when the conditions described in 23 Pa. C.S. § 2511 (a)(1) existed prior to the filing of the Termination of Parental Rights Petition and when the child, S.D.P., has bonded with resource parents, who she considers her "mommy" and "daddy," and who have cared for her and taken care of her every need as S.D.P. has resided with her resource parents since she was three (3) days old." Third, the GAL avers that "[t]he trial court committed an error of law and/or abused its discretion by failing to properly consider the requirements of the Pennsylvania ASFA provisions of the Pennsylvania Juvenile Act as it relates to the permanency for the child, S.D.P."

This 1925(a) Opinion is written in support of the Court's previous Opinion and its decision not to terminate the parental rights of Mother and Father, which was entered on November 29, 2021. For the purposes of the 1925(a) Opinion, the Court incorporates by reference its prior Opinion, dated November 29, 2021, including all findings of fact and conclusions of law as delineated therein. The Court will now address each of the GAL's issues complained of appeal in turn.

1. Whether "[t]he trial court committed an error of law and/or abused its discretion by determining that the Agency had not proven by clear and convincing evidence that involuntary termination of parental rights of Mother and Father was warranted pursuant to [23] Pa. C.S. § 2511(a)(1) when its decision was not supported by competent evidence . . ." as outlined by the GAL in her points (a) through (e).

The trial court did not commit an error of law and/or abuse its discretion by determining that the Agency had not proven by clear and convincing evidence that involuntary termination of parental rights of Mother and Father was warranted pursuant to 23 Pa. C.S. § 2511(a)(1) because the Court's decision was supported by competent evidence.

"[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002). "[T]he finder of fact is free to believe some, all, or none of the evidence presented." *Commonwealth v. Smith*, 146 A.3d 257, 262 (Pa. Super. 2016) (citing *Commonwealth v. Hartle*, 894 A.2d 800, 804 (Pa. Super. 2006). In addition, "[c]redibility determinations fall within the exclusive province of the trial court." *Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007).

"The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1115 (Pa. Super. 2010) (citing *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002). The appellate court "may uphold a termination decision if *any* proper basis exists for the result reached." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citing *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (emphasis added). "If the [trial] court's findings are supported by competent evidence, [the

appellate] court must affirm the [trial] court's decision, even if the record could support an opposite result." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citing *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa. Super. 2004).

"A court *may* terminate parental rights under § 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the *filing* of the termination petition." In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010) (citing In re C.S., supra); 23 Pa. C.S. § 2511(a)(1) (2021) (emphasis added). Additionally,

> "[t]he court should consider the entire background of the case and not simply: mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his [or her] . . . parental rights to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination."

*In re Z.P.*, *supra* at 1117 (citing *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

The following are the Court's responses to the GAL's reasons for raising her first error on appeal under subheadings of (1)(a) through (1)(e):

a. The Agency did file a Preliminary Decree and Petition to Terminate Parental Rights early and prematurely on December 11, 2020, at just eleven (11) months and five (5) days.

The Agency purposely provided a 'compelling reason' not to file the Petition to Terminate Parental rights. The reason given by the Agency was that the child had not yet been in care of the Agency for the statutory fifteen (15) months. *See* 42 U.S.C. § 675(5)(E)(ii). The compelling reason was contained in the Agency's Dependency Petition filed with the Court on March 30, 2020.

-35-

Although the GAL states that the Petition to Terminate Parental Rights was filed five (5) months after June 20, 2020, which was the day following the initial completion date of objectives in Mother's initial child permanency plan, "(C.P.P")", the GAL's argument in no way rebuts the Court's finding that the TPR Petition and Preliminary Decree were filed prematurely. The GAL is attempting to use the wrong metric to argue that the TPR petition was not filed prematurely. The filing of a TPR petition is largely based on how many months that a child is in the care of the Agency, as opposed to how many months have elapsed since the initial goal completion date on the C.P.P. The Court will consider the child's time in care, including any compelling reason provided for not filing at fifteen (15) months. In this case, the TPR should not have been filed prior to the fifteen (15) month mark because there was a compelling reason given for not doing so. A TPR filed at eleven (11) months and five (5) days is nothing but premature and contrary to statute.

Additionally, the Court will also consider the compliance and progress by the parent or parents on the C.P.P. as to whether the Court will allow the parents more time to work on the plan and extend the initial C.P.P.'s goal completion date. Therefore, it is up to the Court to determine if Mother's compliance and progress on the C.P.P. should be afforded more time for completion based on facts provided during the periodic permanency review hearings. The Court found, based on its determination of the facts, and *finding Mother to be credible*, that Mother's compliance and progress on the plan warranted more time to allow Mother to complete her plan.

The initial C.P.P. goal completion dates are meant to be fluid based on progress of the parents and the reasonable efforts of the Agency. The Court, the GAL, and Counsel knows this from experience on many cases where parents have not met the initial C.P.P. goals in the first six months. Holding to the initial goal completion dates in a parent's initial C.P.P. for all cases

would produce an inequitable result. That result is that many parents in cases, such as this one, would automatically fail to complete the C.P.P. because the time allowed to complete objectives is simply not reasonable. The Court conducts periodic reviews to assess the parent's or parents' compliance and progress and to determine the level of compliance. If all the Agency had to do was show that a parent did not meet the initial goal date, then most parents would fail to reunify with their children. Holding parents to those dates is certain to produce an untenable result.

Based purely on the statute, the Agency should not have filed the Petition to Terminate Parental Rights early, especially since it listed its compelling reason for not filing because the child had not yet been in care for at least fifteen (15) months. This demonstrated to the Court that the Agency may not have given Mother a fair opportunity under the law.[1] There needs to be fundamental fairness to parents in this regard because parents do have constitutional rights in this equation, and the statutory filing at fifteen (15) months is the bare minimum to safeguard rights of parents and the legal interest that the child has to be raised by her parents, which is separate from what is in a child's best interest.

    b.  Next, the GAL avers that the filing of the Preliminary Decree was not complete until the parents were served, however the GAL's argument has no merit.

The statutory language in 23 Pa. C.S. § 2511(a) states, "[G]eneral rule.--The rights of a parent in regard to a child may be terminated after a petition *filed* on any of the following grounds:" 23 Pa. C.S. § 2511(a) (2021) (emphasis added). Nowhere in this section does it state

---

[1] Additionally, the Court had growing concerns as this case progressed considering that the Child was placed in a pre-adoptive home straight from the hospital after her birth, and that the Agency had prejudged this case based heavily on its history with the parents over a previously born child that came into Agency care and was adopted. Although the Court considered the Agency's history with the parents, this was only one factor of many that the Court weighed in its decision not to terminate parental rights. The Court also took notice of the Agency's and caseworker's repeated references to the resource or foster home as a potential permanent placement from the onset and throughout this case.

that the petition is considered filed once it is "served" or until "proper service" is made on the Mother and Father.

There was no explanation for the delay in why service on Mother and Father was not made in a timely matter after the Petition to Terminate Parental Rights and the Preliminary Decree was filed on December 4, 2020.[2] The Agency had been readily able to serve Mother and Father for other hearings related to this case. The Agency knew where Mother and Father resided, and the Agency documented to the Court in a filing that the caseworker from Coby's Permanency Unit ("COBY's"), an Agency contractor, mentioned the TPR filing to Mother when he reached her by phone on January 14, 2021. The caseworker did not finally serve Mother and Father with the Petition for Termination of Parental Rights and Preliminary Decree until March 29, 2021.

The Court finds the Agency's delay in serving Mother and Father highly unusual and rather suspect, especially since service to the parents was made on the eve of entering the fifteenth (15th) month that the child would have been in the care of the Agency, and service could have been made much, much sooner. The Preliminary Decree and Petition for Termination of Parental Rights was *filed* with the Court on December 4, 2020. Therefore, the Preliminary Decree and Petition for Termination of Parental rights were "filed" prematurely.

    c. This reason is duplicitous of reason "b." The Court has addressed this by its response to "b." above.

    d. The GAL avers that Mother and Father clearly demonstrated a settled purpose to relinquish their claim to the child. The Court strongly disagrees.

---

[2] The Court found this unexplained failure to timely serve parents as a red flag in terms of the Agency acting in good faith towards the goal of reunification.

The Court outlined is reasoning in great detail in its initial opinion issued in the outcome of this case. "[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002). "[T]he finder of fact is free to believe some, all, or none of the evidence presented." *Commonwealth v. Smith*, 146 A.3d 257, 262 (Pa. Super. 2016) (citing *Commonwealth v. Hartle*, 894 A.2d 800, 804 (Pa. Super. 2006). In addition, "[c]redibility determinations fall within the exclusive province of the trial court." *Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007).

Additionally, "[t]he court should consider the entire background of the case and not simply: mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his [or her] . . . parental rights to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." (citation omitted).

The Court has reviewed the GAL's items in subsections (d.)(i) through (d.)(viii) in her statement of errors on appeal. In these sections, the GAL offers facts, however, the GAL's role is not that of the trier of fact. It is solely the Court's job to determine the truth of those facts. The Court will not address the GAL's delineated subsections in any particular order but submits the following as its response.

The Court found Mother and Father to be credible in their explanations offered for any deficits or challenges and setbacks in working towards reunification and found these explanations to be reasonable and acceptable in light of the overall case. Shifting gears is sometimes necessary. The GAL fails to address that Mother had an incredibly hard time making appointments for her mental health care with rigid scheduling by providers that did not

fit well with her work schedule at the post office. Mother had been "working 7 days a week at the post office 7:30 a.m. until 5:00 p.m. . . . and . . . could not find an evening appointment for months out with [her] therapist." (R. at 86, TPR Hearing – Part 1 on August 9, 2021). Mother also missed visits with S.D.P. on account of her work schedule. Although Father faced short-term incarceration, Father resumed his visitation with S.D.P. after he was released while also getting sober and fully complying with adult probation.

The GAL avers that Mother failed to complete her parenting skill objective due to her own inaction. In reality, this objective was being withheld from Mother by the Agency until she completed her mental health and drug and alcohol goal as is the Agency's policy despite the Court being clear that this is not a reasonable practice. However, in this case, it is extremely unfair to Mother for the Agency to withhold the parenting education pending completion of her mental health and drug and alcohol counseling because that counseling will be an ongoing aspect of Mother's life to maintain her sobriety and will continue for an indefinite period of time. It was also explained to the Court that there is a long waitlist for parents to receive the teachings of a parent educator once the parent is approved to proceed with that program. It follows then that there will be further delay of Mother receiving access to this program required by her C.P.P. In retrospect, the Court should have found no reasonable efforts by the Agency to promptly provide this service because the service had yet to be offered.

The GAL avers that the Mother failed a urine screen drug test on July 2, 2020, and August 31, 2020, for methamphetamines and amphetamines, and had a positive saliva test for methamphetamines on September 21, 2020. However, the Agency produced no test results into evidence, instead the Agency caseworker offered secondhand, hearsay testimony about these tests. Therefore, this is purely a credibility determination for the Court to make. The Court did

not find the COBY'S caseworker's statements from others to be credible regarding these test results. When the GAL asked Mother during her testimony about these tests, Mother testified that she had a "negative urine screen and a positive saliva test, but the saliva test was not sent to the lab [to be verified], and I know that I didn't do that." (R. at 18, TPR Hearing – Part 2 on September 27, 2020). The Agency did not provide any concrete evidence to confirm Mother's test results on these specific test dates where there was a factual dispute.

The Court found Mother to be credible in her response to the GAL's question. It was clear to the Court that Mother made obvious progress in dealing with her drug addiction. The Court understands that overcoming addiction is often a long-term struggle. It is a fact that Mother had obtained sobriety prior to the TPR filing, and whether that was in June of 2020 or in September of 2020, as the GAL avers, is irrelevant. Mother had abated the Agency's only real concern for Mother to be able to parent the child. Even if a relapse were to occur, that is a part of the process. As long as the child is safe, the parents should continue to parent.

The GAL also avers that the last time Father has a positive drug screen was September 28, 2020. While that may be true, Father did achieve sobriety, and this was long before the filing of the TPR Petition and Preliminary Decree in December of 2020. The Court does not find that Father evidenced a settled purpose of relinquishment of his claim to the child.

The Court found Mother to be credible in her responses to the GAL. Father was also credible. The parents' explanations were reasonable. The Court viewed the facts and evidence in light of the totality of the circumstances and ruled that involuntary termination was not clearly warranted because neither Mother nor Father evidenced a settled purpose for relinquishment of his or her parental claim to the child.

-40-

The GAL also avers that Mother's residence is not safe as evidenced by Mother's testimony that there is a smell of marijuana in the stairwell of their apartment. This is a public stairwell in an apartment building, and the parents have no control over that. Although Mother mentioned that she resides in a musty, old building with no ventilation, the COBY'S caseworker found Mother's residence to be appropriate when he inspected the home in July of 2021. A building can by musty and old with no ventilation, but that does not make Mother's residence not appropriate or not safe. If Mother's residence was not appropriate or not safe, the COBY'S caseworker should have said so since he had recently surveyed Mother's home. He did not. When asked, "[i]s the home appropriate?" the COBY'S caseworker replied, "It is." (R. at 9, TPR Hearing – Part 1, August 9, 2021). The Court determined that Mother's home was appropriate based on the facts presented. Therefore, the GAL's claim that Mother's residence is not safe is without merit.

The GAL avers that Mother cannot ensure the child's safety while left in the care of Father because he doesn't have a valid driver's license and vapes marijuana in the car. The Court is aware that Father does not have a driver's license. However, the issue that Father would drive the car with the child in it is speculative. There was no direct evidence that Father ever drove the car with the child in it. Therefore, the issue of Father driving the car with the child in it is purely conjecture on the GAL's part.

As far as Father vaping marijuana in the car, the Court was not convinced that this vaping incident even occurred. The Court did not find the COBY's caseworker's testimony credible regarding the incident. This was an apparent attempt by the caseworker to use anything that would put parents in a negative light.[3] The caseworker's statement was difficult to believe,

---

[3] The Court refers back to its first footnote in this Opinion with respect to how quickly this case was moving toward adoption.

-42-

especially since the caseworker said in the same hearing when he was asked if he "had any concerns with [FATHER] being in the home with [S.D.P.]," his response was, "At this point, the concern would be that [Father] hasn't had a plan and hasn't proven that he would be appropriate in accordance with a plan." (R. at 11, TPR Hearing – Part 1, August 9, 2021). Therefore, the Court did not find the caseworker credible on this allegation, nor did the Court find that any safety concerns exist despite what the GAL is trying to allege.

The Court has already addressed Mother's reasons for declining virtual visitation in its initial opinion when in-person visits were postponed due to Covid-19 precautions and found Mother's reasons acceptable in light of the unusual circumstances that the pandemic has caused. When the Court had the child on video during a status hearing in the case, all the child was able to do was wave to the Court. That was it, so the Court can understand Mother's position for the lack of benefit from that type of interaction with the child.

e. The GAL states that Mother and Father clearly failed to affirmatively perform any parental duties . . . until the eleventh hour . . . . However, the Court did not find this to be true on the facts of the case.

As the trier of fact, the Court found, and as stated in its initial opinion, that Mother performed parental duties that were reasonable in accordance with the permanency plan. (Page 15 of the Court's Initial Opinion, dated November 29, 2021.) And, the Court found, as stated in its initial opinion, that Father had not failed to perform parental duties that would be reasonably expected in this case despite not having a permanency plan to complete. (Page 15 of the Court's Initial Opinion, dated November 29, 2021). Additionally, the GAL avers that Mother and Father failed to attend any of S.D.P.'s medical appointments. However, there was no testimony that Mother and Father were ever told of these appointments or invited to attend by the Agency or by

-43-

anyone else. If Mother and Father were not made aware of these appointments, Mother and Father could not be expected to attend. Therefore, the Court holds steadfast to its position that Mother and Father did not fail to perform parental duties because of the facts in this case despite the GAL's claim to the contrary.

2. Whether "[t]he trial court committed an error of law and/or abused its discretion by not analyzing the developmental, physical, and emotional needs and welfare of the child, S.D.P., pursuant to 23 Pa. C.S. § 2511(b) when the conditions described in 23 Pa. C.S. § 2511 (a)(1) existed prior to the filing of the Termination of Parental Rights Petition and when the child, S.D.P., has bonded with resource parents, who she considers her "mommy" and "daddy," and who have cared for her and taken care of her every need as S.D.P. has resided with her resource parents since she was three (3) days old."

The trial court did not commit an error of law and/or abuse its discretion by not analyzing the developmental, physical, and emotional needs and welfare of the child, S.D.P. pursuant to 23 Pa. C.S. § 2511(b) because the trial court did not find any statutory grounds for termination under § 2511(a)(1), (2), or (5). Therefore, the Court was not required to complete an analysis under § 2511(b) as the GAL insists.

Even if the Court were to have found statutory grounds for termination, the Court approved an initial C.P.P. with a goal of reunification at the very beginning when Mother's and Father's life circumstances were such that those circumstances warranted a finding of dependency. However, "[i]f Mother was deemed suitable for reunification at the time of a finding of dependency [or the court's adoption of the initial C.P.P.] then [Mother] must still be suitable for reunification [a year and a half] later when her circumstances are that much better."

-45-

*In re R.M.G.*, 997 A.2d 339, 350 (Pa. Super. 2010). The Agency's primary concern for the family at intake of care of S.D.P. by the Agency was Mother and Father's drug use. This concern ceased to exist prior to the filing of the Termination of Parental Rights Petition in December of 2020.

Although the Court did not opine on what would be in the child's best interests because it is not statutorily required, the Court did consider the child's needs overall and the child's welfare if the child were to be reunified with Mother and Father in making its determination not to terminate parental rights and allow Mother more time to complete her plan. The Court evaluated both the child's legal interests as well as the child's best interests.

The Court considered the totality of the circumstances in this case. Setting aside Mother and Father's history with the Agency with a prior child in the Agency's care, who has since been adopted, and objectively considering this case with S.D.P. on its own merits, Mother and Father are capable of caring for S.D.P. in all the ways parents would be expected to care for their own child even if Mother's plan has a few final details to complete before reunification can occur, .and even if Father was not granted a plan. The Court anticipates that Mother will complete her plan, and Father has abated those conditions that were cause for the Agency's concern.

The GAL insists that the bond that the resource parents have with S.D.P. is paramount, and it is that bond that should be the undoing of the Court's decision.[4] However, it would not be fair to compare the bond with the resource parents versus the biological parents. The biological parents are at grave disadvantage because they are at the Agency's mercy for limited visitation, at most four hours per week and two hours per visit, whereas S.D.P. was placed in a potential permanent placement from three days old and has remained with the same resource family

---

[4] The Court is concerned about the objectivity of the GAL in this matter given her responsibilities to S.D.P. as her client and the regular contact and interaction necessary with the resource parents to be able to engage with S.D.P.

-45-

throughout this proceeding. See *In re A.S.*, 997 A.2d 339, 350 (Pa. Super. 2010) ("[A]gency [contended] that there is no bond between Mother and child and that there is a closer relationship between the child and the foster mother. This is true only because the agency has so severely limited contact between Mother and child that is was impossible for her to form a bond with the child.").

Additionally, the record does not reflect that Mother and Father do not have a bond with the child. In fact, the Agency documented that when Mother visits S.D.P., "Mother is appropriate and loving towards [the child] . . . [and] is aware of the developmental stage that her daughter is in and engages with her appropriately." (Agency's Dependency Petition filed on 3/30/21). The Agency also noted that when Father visits S.D.P., "he interacts very appropriately, . . . plays with her, encourages her to crawl/walk, feeds her, and changes her diaper." (Agency's Dependency Petition filed on 3/30/21).

The GAL contends that the bond between the child and the resource parents is what matters, however, the GAL ignores any bond that the child has with her biological parents. The GAL neglects to consider the child's legal interests and has only considered what the GAL believes to be in the child's best interests. However, "[t]he best interests determination belongs to the Court." *In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017).

"In cases involving children, the law acknowledges two separate and distinct categories of interest: a child's legal interests, which are synonymous with the child's preferred outcome, and a child's best interests, which the trial court must determine." *Id.* As a legal interest, a child has an interest in the ability to enjoy the child's birthright, to be raised by her biological parents. Of course, the child being able to be parented by the biological parents comes with the caveat that the Court finds that the parents are capable of parenting the child. Mother and Father have

-46-

demonstrated credibly, Mother by working through her plan which is nearly complete, and Father, who was without a plan but completing goals similar to Mother's that are essentially complete, minus a would-be parenting goal if Father actually had a plan, that Mother and Father are capable of parenting the child. Mother and Father have come a long way from where the Court first found them. Additionally, S.D.P. is not of the age where she can express her wishes, so it is important for the Court to consider both the legal interests of the child as well as the child's best interests. Therefore, the Court continues to maintain its position with respect to Mother and Father and did not err in its decision not to address § 2511(b) when the Court found no grounds for termination.

3. Whether "[t]he trial court committed an error of law and/or abused its discretion by failing to properly consider the requirements of the Pennsylvania [Adoption and Safe Families Act of 1997] ("ASFA") provisions of the Pennsylvania Juvenile Act as it relates to the permanency for the child, S.D.P."

The Court did not commit an error of law or abuse its discretion by failing to properly consider the requirements of the Pennsylvania ASFA provisions . . . as it relates to the permanency for the child, S.D.P. because it was not appropriate for the Court to consider ASFA because (1) this issue was not raised at the trial court level by the GAL or any other party, which waives the issue, and (2) in the alternative, the Agency had not finished making reasonable efforts in this case.

As the general rule, "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa. R.A.P. 302 (2021). The GAL is raising this issue for the first time, and therefore, should not be permitted to proceed on appeal with this issue. However, if the

appeals court determines that this issue was raised, then in the alternative, the Court provides the following rebuttal to the GAL's argument.

"[W]hen a child is placed in foster care, *after* reasonable efforts *have been* made to reestablish the biological relationship, [then] . . . Children and Youth Services and foster care institutions . . . work towards termination of parental rights, [and] placing the child with adoptive parents." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010) (emphasis added). What has occurred in this case is not the parents' failure to benefit by such reasonable efforts, but instead, from the failure of reasonable efforts to be made. Part of reasonable efforts includes allowing a reasonable amount of time for parents to remedy the cause or circumstances that gave rise to the child's dependency. The Agency's rush to file the TPR petition prior to providing the parents with services strikes to the core of the case, and the Court's decision. The Agency prematurely filed the TPR Preliminary Decree and TPR petitions prior to making reasonable efforts. The Agency did not inspect Mother's home until — *after* the filing of the TPR Petition. The Agency withheld services, such as the parent educator, as outlined in the C.P.P.

The purpose of ASFA is "[t]o remove children from foster placement limbo where they know neither a committed parent nor can they look towards some semblance of a normal family life . . . ." *Id.* The Court finds that S.D.P. has committed biological parents, finding both parents credible in their efforts at reunification. The Court also finds that the child will be able to achieve "some semblance of a normal family life" with her own parents. *Id.* There is no danger of foster care drift in this case considering how close Mother is to completing her plan, and Father alongside her, without a plan.

The child, from three days old, has been placed in the same, prospective pre-adoptive resource home. Allowing Mother and Father a reasonable amount of time to complete the plan

-48-

will have no negative impact on the child's current living situation. In the event that reunification cannot occur, the child will likely be adopted by the family where she currently resides. Therefore, the Court finds that the parents should have more time to receive reasonable efforts for reunification. There is no current concern for foster care drift because the child is already in a potentially permanent placement.

## CONCLUSION

The Court maintains that the Agency has not proven by clear and convincing evidence that involuntary termination of Mothers and Father's parental rights to S.D.P. are warranted, pursuant to Section 2511(a)(1), (2), or (5). Therefore, no grounds for termination exist.

BY THE COURT:

DAVID R. WORKMAN, JUDGE

ATTEST: /s/ Saskia Sayeg
Deputy Clerk of Orphan's Court

Copies to:    Albert J. Meier, Esq., Counsel for Mother
              Patricia L. Dunlevy, Esq., Counsel for Father
              Christine PfauLaney, Esq., Counsel for the Agency
              Kathleen E. Holmes, Esq., Guardian ad Litem

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA O.C. RULE 4.6.
NOTIFICATION: THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
WITH THE ORPHANS' COURT OF LANCASTER COUNTY, PA.
DATE: 01/25/2022